UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EVANSTON INSURANCE COMPANY, a foreign insurance company, and AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, a foreign insurance company,<br><br>Plaintiffs,<br><br>v.<br><br>WESTCHESTER SURPLUS LINES INSURANCE COMPANY, a foreign insurance company, ROYAL INSURANCE COMPANY OF AMERICA A/K/A ROYAL INSURANCE COMPANY, a foreign insurance company, individually and as successor to Royal Insurance Company of America a/k/a Royal Insurance Company, NORTHWEST TOWER CRANE SERVICE, INC., and JOHN DOES I-V,<br><br>Defendants. | Case No. C07-923-MJP<br><br>ORDER ON DEFENDANT WESTCHESTER SURPLUS LINES INSURANCE COMPANY AND ROYAL INSURANCE COMPANY OF AMERICA A/K/A/ ROYAL INSURANCE COMPANY'S MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on defendant Westchester Surplus Lines Insurance Company and Royal Insurance Company of America a/k./a Royal Insurance Company's ("Defendants") motions for summary judgment. (Dkt. Nos. 32 & 34.) Having considered Defendants' motions and replies (Dkt. Nos. 40 & 41), the declarations attached to Defendants' motions and reply (Dkt. Nos. 33, 35, & 42), Plaintiffs' response, declarations, and surreplies (Dkt. Nos. 36-39, 44-45), the complaint (Dkt. No. 1), and the balance of the record, the Court GRANTS Defendants' motions for summary judgment.

ORDER — 1

**Background**

The dispute between Plaintiffs and Defendants arises out of an accident involving a personnel hoist that occurred on June 26, 2002 at a construction site owned by Bellevue Master LLC ("Bellevue Master"), called the Lincoln Square Project in Bellevue, Washington. In 2002, prior to the accident, Bellevue Master hired Bovis Lend Lease as the construction manager, who then hired Champion Elevators, Inc. ("Champion") to supply, erect, and dismantle personnel hoists for the project. (Olson Decl., Ex. 11, Dkt. No. 33-11.) In April 2002, Champion orally agreed to subcontract the personnel hoist work to Northwest Tower Crane Service, Inc. ("Northwest"). (Olson Decl. Ex. 3, Dkt. No. 33-3, at ¶ 5.) David Weber, owner of Northwest, and Kevin Lavorgna, agent of Champion, met in Bellevue and orally agreed to the terms of work, including the pricing, scope of work, and scheduling. (See Lavorgna Dep., Dkt. No. 33-6, at 5; see also Dkt. No. 33-14 at 2 (letter discussing installation, jump, and dismantle prices).) Weber and Lavorgna never discussed terms regarding insurance or indemnification.

Prior to the agreement between Champion and Northwest, Northwest had performed work directly for Bellevue Master. In 2001, Bellevue Master contracted with Northwest to erect and dismantle tower cranes at the Lincoln Square Project. (Brady Decl., Dkt. No. 39-3.) Work was completed in 2001. None of the parties has produced a copy of the contract, though Plaintiffs claim that one exists.

On May 4, 2002, Northwest began installation of the personnel hoist and completed the first phase of the project on May 7, 2002. On May 21, 2002, Kevin Lavorgna of Champion sent Northwest a purchase order and subcontract agreement. (Dkt. Nos. 33-14 & 33-15.) The purchase order specified the erection, jump, dismantle, and permitting of the personnel hoist at a price of $44,250, which Northwest confirms as the agreed-upon price. (Id.; see Weber Dep., Dkt. No. 35-4 Ex. 5 at 133-34.) The purchase order also stated that the terms were "Subject to the return of the signed subcontract which is attached herto [sic] and made a part of this Purchase Order." (Olson Decl. Ex. 15, Dkt. No. 33-15.)

ORDER — 2

   The subcontract contained terms that neither party had discussed. Most notably, the subcontract required Northwest to indemnify Champion and Bellevue Master and to waive employer immunity. (See Lavorgna Dep., Dkt. No. 13 at 76.) Northwest did not sign or return the subcontract. Testimony is conflicting as to whether David Weber communicated with Kevin Lavorgna about his dissatisfaction with the contract. Weber claims he left a message with Lavorgna expressing his refusal of the subcontract. Weber states that he did not sign the subcontract because he noted the one-sided nature of the contractual terms and was advised by his counsel not to sign. Lavorgna denies the existence of Weber's message. (Lavorgna Decl., Dkt. No. 38-5 at ¶¶ 5-6.) However, no one disputes that Northwest did not sign or return the subcontract or purchase order. There were no further discussions over the subcontract until after the June 26, 2002 accident occurred. (Id.)

   Despite not having signed the subcontract, Northwest proceeded to dismantle the hoist under Champion's direction. On June 26, 2002, while dismantling the hoist, three Northwest employees fell seventy feet in a hoist. The employees were severely injured in the fall. (Tomasello Compl., Dkt. No. 33-9.) They filed suit in the U.S. District Court for the Western District of Washington (CV03-3650-Z) against Champion, which then brought third-party claims against Bellevue Master and Northwest. (Id.; Consolidated Compl., Dkt. No. 35-4, at 96-104.) The three injured employees ultimately settled their claims with Champion and Bellevue Master and their insurance carriers, Evanston Insurance Company ("Evanston") and American Guarantee and Liability Insurance Company ("American Guarantee"). Evanston and American Guarantee now seek indemnification from Northwest's insurers, claiming that they are additional insureds under Northwest's insurance policies.

   During the relevant time period, Northwest had a primary policy with Westchester Surplus Lines Insurance Company ("Westchester") and an excess policy with Royal Insurance Company of America ("Royal"). (Dkt. Nos. 35-1 at 5-8, 35-2 at 62-63.) The Westchester policy contained an additional-insured endorsement extending coverage "as required by contract, provided the

ORDER — 3

contract is executed prior to loss." (Dkt. No. 35-1, Ex. 1, at 35.)  Royal provided bodily-injury coverage to Northwest and its insureds, but the policy did not specify who was an additional insured.  Royal argues, without objection, that if any third-party was an insured under the Westchester policy, it would also have been an additional insured under the Royal policy for excess coverage. (Pl. Royal's Mot. for SJ, Dkt. No. 34 at 7.)  On June 27, 2002, one day after the accident, Northwest's insurance brokers at JBL&K Risk Services issued a certificate of insurance to Champion that stated Champion had coverage as an additional insured.  (Olson Decl., Dkt. No. 33-16.)  However, the record does not reflect who requested the certificate.

Plaintiffs originally filed this case in King County Superior Court.  (Not. of Removal, Dkt. No. 1.)  Royal removed to this Court on June 14, 2007.  (Id.)  Jurisdiction is proper under 28 U.S.C. § 1332.

## Discussion

**I.      Motion to Strike**

Plaintiffs have moved to strike the majority of the exhibits submitted by Defendants in support of their summary judgment motion.  Plaintiffs contend variously that: (1) certain documents lack foundation or have not been authenticated; (2) certain deposition transcripts lack the court reporter's certification; and (3) several declarations contain statements from declarants who lack personal knowledge to make such statements.  Defendants respond that: (1) many of the documents were authenticated by virtue of Plaintiffs disclosure thereof; (2) the deposition transcripts were marked as certified copies and Plaintiffs have submitted identical copies of the same depositions; and (3) the declarants did have personal knowledge to support their statements.

Several of the documents to which Plaintiffs object are irrelevant to the decision of Defendants' motion for summary judgment.  The Court does not rely on that information to decide the summary judgment motion and does not address Plaintiffs' motion to strike those exhibits.  In regards to the remaining disputed documents which are relevant, the Court DENIES Plaintiffs' motion to strike.

ORDER — 4

As an initial matter, "unauthenticated documents cannot be considered on a motion for summary judgment." Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987). "[D]ocuments must be authenticated by and attached to an affidavit that meets the requirements of [Fed. R. Civ. P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2722 at 58-60 (2d ed. 1983) (footnotes omitted). Documents that have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment. See Canada, 831 F.2d at 925.

Under Federal Rule of Evidence 901, authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "The question of authenticity is left to the discretion of the trial judge and is reviewed on appeal under an abuse of discretion standard." United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985). However, the proponent of the evidence need only make a prima facie showing of its authenticity. Id. Importantly, "[d]ocuments produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent." Anand v. BP West Coast Prods. LLC, 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007). An opposing party may not subsequently challenge an attorney's ability to authenticate documents attached to her declaration that were previously provided by the opposing party without objection as to their authenticity. See Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996).

**A.      Declaration of William Olson and Exhibits 1 and 2**

Plaintiffs contend that Westchester's Attorney, William Olson, cannot authenticate Exhibits 1 and 2 to Westchester's motion for summary judgment. These documents are the Westchester policy declarations (Exhibit 1) and the Westchester policy endorsements for Northwest's Commercial General Liability policy (Exhibit 2). Plaintiffs assert that because one endorsement related to additional insureds is not the same as the endorsement submitted by Royal

as the relevant Westchester endorsement (Love Decl. Ex. 1, Dkt. No. 35-2, at 35) neither endorsement can be reliable. Westchester responds that Exhibits 1 and 2 are authenticated because Plaintiffs have previously attested to the veracity of the exhibits. (See Maydew Decl. Ex. A, Dkt. No. 15.) Because Plaintiffs have already attested to the authenticity of these documents, they may not now challenge their veracity. See Anand, 484 F. Supp. 2d at 1092 n.11; Maljack, 81 F.3d at 889 n.12. Moreover, the two allegedly conflicting endorsements contain the same exact language and present no conflict as to the authenticity of the documents. One is simply an older copy of the same endorsement. Royal has explained that the 1985 endorsement is not at issue and there is no dispute that the 1997 endorsement is correct.

The Court denies Plaintiffs' motion to strike Olson's Declaration and exhibits 1 and 2 attached thereto.

### B. Deposition Transcripts

Plaintiffs contend that Olson's exhibits 4 (Weber's Deposition transcript) and 5 (Lavorgna's Deposition transcript) lack authenticity because they are uncertified transcripts. Defendants respond that the exhibits are certified copies and that Plaintiffs have already obtained these same transcripts in discovery and rely on them in Barbara Brady's declaration and exhibits in support of Plaintiffs' response brief. (Dkt. No. 38.)

Exhibit 7 does have "Certified Copy" stamped on it, but the others lack such a stamp. All three exhibits lack a signature page. However, attached to its reply brief, defendant Royal submitted the certificates of authenticity from the court reporters who transcribed the depositions. This alone is sufficient to authenticate the documents. See In re Entropin, Inc. Sec. Litig., 487 F. Supp. 2d 1141, 1143 n.1 (C.D. Cal. 2007) (denying a motion to strike where defects in deposition transcripts were corrected by a supplemental declaration); Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774 (9th Cir. 2002) ("A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent.").

ORDER — 6

Moreover, Plaintiffs have submitted identical transcripts in their response to Defendants' motion and cannot now contest the veracity and authenticity of an identical document. See Anand, 484 F. Supp. 2d at 1092 n.11. (See Dkt. Nos. 13-5, 38-1, & 38-2.)

The Court denies Plaintiffs' motion to strike exhibits 4 and 5 to Olson's declaration.

### C. The Subcontract and Purchase Order: Olson's Exhibits 14 and 15

Plaintiffs move to strike Olson's exhibits 14 (Purchase Order from Champion to Northwest) and 15 (Subcontract from Champion to Northwest). Defendants respond that exhibits 14 and 15 were produced by Northwest in discovery under verifications, and that Plaintiffs cite to Exhibit 14 as valid evidence supporting its opposition (Pls. Opp. to Mot. for SJ, Dkt. No. 39, at 10-11).

Defendants are correct that Plaintiffs cannot both contest the veracity of and also rely on the accuracy of exhibits 14 and 15. See Anand, 484 F. Supp. 2d at 1092 n.11. Moreover, although the subcontract references different part number, the fax date-stamping indicates this document was part of the same transmission from Champion to Northwest with the purchase order that references the subcontract (Exhibit 14). This supports a prima facie showing of authenticity. See id.

The Court denies Plaintiffs' motion as to exhibits 14 and 15 to Olson's Declaration.

### D. Weber Declaration

Plaintiffs move to strike those portions of David Weber's declaration (Olson Decl. Ex. 3, Dkt. No. 33-3) that relate to the oral agreement between Northwest and Champion. Defendants respond that Plaintiffs fail to be specific in their objection to the declaration and that Weber's testimony is consistent with Champion's own testimony. Plaintiffs' argument overlooks the fact that Weber provided substantial detail as to the oral contract, which is corroborated by testimony of Champion's own agent. The Court denies Plaintiffs' motion as to this declaration.

## II. Motion for Continuance

Plaintiffs ask the Court to continue discovery pursuant to Rule 56(f) if it chooses to deny

ORDER — 7

1 their motion to strike. Plaintiffs assert that they seek essential information to rebut Defendants'
2 summary judgment motion, on the basis that Northwest had agreed to indemnify Bellevue Master
3 for all work at the work site. Plaintiffs wish to issue further subpoenas of non-parties and to
4 conduct depositions. Plaintiffs have issued three subpoenas since the last filing related to
5 Defendants' summary judgment motion. (See Dkt. Nos. 48-50.) Plaintiffs do not claim that
6 Defendants have engaged in any disruptive or improper behavior during discovery.

7 "A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the
8 specific facts that further discovery would reveal, and explain why those facts would preclude
9 summary judgment." Tatum v. City and County of San Francisco, 441 F.3d 1090, 1100 (9th Cir.
10 2006). Generally, "a district court should continue a summary judgment motion upon a good
11 faith showing by affidavit that the continuance is needed to obtain facts essential to preclude
12 summary judgment." State of Cal., on Behalf of Cal. Dept. of Toxic Substances Control v.
13 Campbell, 138 F.3d 772, 779 (9th Cir. 1998). However, "[t]he failure to conduct discovery
14 diligently is grounds for the denial of a Rule 56(f) motion." Pfingston v. Ronan Eng'g Co., 284
15 F.3d 999, 1005 (9th Cir. 2002) (citation omitted). "District courts have wide latitude in
16 controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of
17 discretion." Campbell, 138 F.3d at 779 (citation and quotation marks omitted).

18 Defendants must show: "(1) that they have set forth in affidavit form the specific facts that
19 they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these
20 sought-after facts are 'essential' to resist the summary judgment motion." Id. "Denial of a Rule
21 56(f) application is proper where it is clear that the evidence sought is almost certainly nonexistent
22 or is the object of pure speculation." Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991)
23 (citation omitted). Moreover, Rule 56(f) requires that "the party seeking the continuance must
24 show that it lacks the 'facts essential' to resist the summary judgment motion." McCormick v.
25 Fund Am. Cos., Inc., 26 F.3d 869, 885 (9th Cir. 1994).

26 Plaintiffs' request for a continuance appears based on highly speculative assumptions that
27

ORDER — 8

they might obtain a 2001 contract between Northwest and Bellevue Master that may include contractual language beneficial to Plaintiffs' position. It is unclear that Plaintiffs believe they can actually obtain the contract. The lack of clarity in the declaration in support of the continuance suggests that the facts may not exist at all and that the information sought is "pure speculation." See Terrell, 935 F.2d at 1018. Moreover, the evidence Plaintiffs submit in support of their contention that Northwest had agreed to indemnify Bellevue Master in 2002 does not support their request for a continuance. The 2001 purchase order between Northwest and Bellevue Master included in the motion is clearly limited to the job Northwest was to perform and not for all work at the Lincoln Square Project.

Plaintiffs have been afforded ample time to discover this contract. This case commenced in King County Superior Court in 2006 and American Guarantee issued its first set of interrogatories in September, 2006. Plaintiffs knew or should have known that any claim for indemnification based on Northwest and Bellevue Master's dealings would require a contract as evidence. Moreover, there is also little evidence that Defendants have engaged in dilatory discovery practices. The inability to find essential facts in such a long period of time suggests a lack of diligence that supports denial of Plaintiffs' motion. See Pfingston, 284 F.3d at 1005.

The Court DENIES Plaintiffs' motion of continuance of discovery.

**III.    Plaintiffs Are Not Entitled to Indemnification**

Defendants contend that summary judgment is proper because no disputed material facts exist that support Plaintiffs' contention that they qualify as additional insureds under either Northwest's Westchester or Royal policies. The parties agree that there is only one way Plaintiffs can obtain indemnification: they must be additional insureds under the language of Westchester's policy. The Westchester policy states that a party becomes an "additional insured" if "required by contract, provided the contract is executed prior to loss." (Olson Decl. Ex. 2 at 12.) Thus, Bellevue Master or Champion must have "executed" contract with Northwest requiring indemnification of Bellevue Master or Champion prior June 26, 2002 (the date of "loss").

Plaintiffs submit that: (1) they are insureds by virtue of a contract entered into between Bellevue Master and Northwest for a different job fully performed in 2001; and (2) they are insured because Northwest agreed to indemnify Champion and Bellevue Master in 2002 by accepting the subcontract Champion issued to Northwest requiring indemnification. Defendants respond that: (1) there was no 2001 contract requiring indemnification through 2002 because there is neither a contract so stating nor evidence of intent to provide such long-term indemnification coverage; and (2) Northwest never accepted the terms of the 2002 subcontract from Champion. Defendants are correct.

### A.  Summary Judgment Standard

After considering the evidence in the light most favorable to the non-moving party, the Court must grant summary judgment if there are no "genuine issue[s] of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

### B.  Washington's Insurance Policy Standards of Interpretation

The Court applies Washington law to this diversity action. See Jorgensen v. Cassiday, 320 F.3d 906, 914 (9th Cir. 2003). Under Washington law, summary judgment is proper where the decision turns on the interpretation of an insurance policy, which is a question of law. Allstate Ins. Co. v. Peasley, 131 Wn.2d 420, 423-24 (1997). The Court must view the policy in its entirety, Hess v. North Pac. Ins. Co., 122 Wn.2d 180, 186 (1993), and give effect to each provision in the policy, Kish v. Ins. Co. of N. Am., 125 Wn.2d 164, 170 (1994). Undefined terms in an insurance contract must be given their "plain, ordinary, and popular" meaning. Boeing Co.

ORDER — 10

v. Aetna Cas. and Sur. Co., 113 Wn.2d 869, 877 (1990) (citation omitted). The Court should "determine the ordinary meaning of an undefined term" by using "standard English language dictionaries." Id. A policy term is ambiguous "only if the language on its face is fairly susceptible to two different but reasonable interpretations." Allstate, 131 Wn.2d at 424 (internal citation and quotation omitted). "When analyzing an insurance policy and questioning whether an ambiguity exists, we look at the language according to the way it would be read by the average insurance purchaser." Id.

### C. The Relevant Policy Language in Dispute

Northwest's Westchester policy provides additional insured status to third-parties "as required by contract, provided the contact is executed prior to loss." (Maydew Decl., Dkt. No. 15-2 at 12.) The parties dispute what "executed" means. Defendants claim it means signed or fully performed, while Plaintiffs assert that it means "to carry out what is required by the contract." Neither party is correct.

The Court determines the meaning of "executed" by considering the term's "plain, ordinary, and popular" meaning, using a standard English dictionary. Boeing, 113 Wn.2d at 877.[1] Several dictionaries have legal-specific and generic definitions of the term "execute." The American Heritage Dictionary defines the term as: "To make valid, as by signing: execute a deed." American Heritage Dictionary at 621 (4th ed. 2006). Webster's defines the term more generally as "to perform what is required to give validity to <~ a deed>." Webster's Ninth New Collegiate Dictionary at 434 (1986). Considering that this term was used in an insurance contract where the parties may lack legal sophistication, the generic meaning of the term is most appropriate. See

---

[1] Defendants contend that the New York Supreme Court Appellate Division's decision in Rodless Prop., L.P. v. Westchester Fire Ins. Co., should guide the Court. 835 N.Y.S.2d 154 (App. Div. 2007). The Rodless court considered the exact same Westchester policy and concluded that "executed" meant that a contract was either written and signed or fully performed. Id. at 155. The court, however, only referred to Black's Law Dictionary, which does not accord with Washington law's requirement to use common-language dictionaries. See Boeing, 113 Wn.2d at 877. Thus, Rodless does not guide the Court.

ORDER — 11

1   Allstate, 131 Wn.2d at 424 (considering the average insurance purchaser).  For the purposes of

2   Plaintiffs' claims, the Court construes "execute" to mean to "perform what is required to give

3   validity."  Id.  Executing a contract thus means showing offer, acceptance, and bargained for

4   consideration.  See Citizens for Des Moines, Inc. v. Petersen, 125 Wn. App. 760, 766 (2005)

5   ("For a contract to exist, there must be an offer, acceptance, and consideration.")  There is no

6   requirement to have the contract written, signed, or fully performed.

**D.   The 2001 Contract Between Bellevue Master and Northwest Cannot Be Construed to Provide Indemnification to Bellevue Master for the 2002 Accident**

9   Plaintiffs contend that they are additional insureds under Northwest's Westchester policy

10  by virtue of a contract executed in 2001 between Northwest and Bellevue Master for the erection

11  and dismantling of tower cranes in 2001 at the Lincoln Square Project.  Although Plaintiffs have

12  not produced this contract, they state the Court must construe this agreement as the basis for

13  indemnification.  Plaintiffs argue that in order for Northwest to have performed any work at the

14  Lincoln Square site in 2001 and 2002, it would have had to and did provide, in contract,

15  indemnification to Bellevue Master.  Plaintiffs also point to certificates of insurance as proof of

16  indemnification.  Defendants respond that Plaintiffs have not produced a signed contract between

17  Northwest and Bellevue Master and that even if they do produce it, it would not provide for

18  broad, long-term indemnification.  (See Def. Royal's Mot. for SJ, Dkt. No. 34, at 11.)  Rather,

19  the contract would only have provided indemnification for the work actually performed by

20  Northwest for Bellevue Master in 2001 in regards only to tower cranes, not personnel hoists.

21  Plaintiffs have submitted several documents suggesting that contractors working for

22  Bellevue Master were required to indemnify Bellevue Master in order to perform work at the

23  Lincoln Square site even as a subcontractor.  However, there is nothing in the documents

24  suggesting that the contractor was required to provide insurance for all future work performed at

25  the site.  Plaintiffs obviate this by trying to rely on U.S. Oil & Refining Co. v. Lee & Eastes Tank

26  Lines, Inc. for the proposition that a contract for work at a project site that requires

27

ORDER — 12

indemnification will apply to all future work performed at that site. 104 Wn. App. 823 (2001). In U.S Oil, Lee & Eastes and U.S. Oil entered into an agreement in 1985 for the loading and transportation of hot asphalt from U.S. Oil's facility in Tacoma, Washington. Id. at 827. Lee & Eastes was required to indemnify U.S. Oil and name U.S. Oil as an additional insured on its comprehensive general liability policy. Id. U.S. Oil's CEO testified that the insurance was sought to "for all claims which might arise out of the presence of Lee & Eastes' employees on the premises." Id. at 827-28. Lee provided no contrary evidence. A man injured in 1994 at U.S. Oil's facility sued U.S. Oil, who tendered its defense to Lee & Eastes. Lee & Eastes rejected the tender and U.S. Oil subsequently sued for indemnification and breach of contract. Id. at 828. The court concluded that Lee & Eastes did owe a contractual duty to indemnify U.S. Oil because the original agreement showed an intent that Lee & Eastes would and did obtain long-term insurance coverage. On this basis, the court held that the Lee & Eastes owed a duty to indemnify U.S. Oil. Id. at 840.

The facts here are distinguishable from U.S. Oil. First, the contractual relationship between Northwest and Bellevue Master is unrelated to the work Northwest performed as a subcontractor for Champion. Although Bellevue Master and Northwest contracted directly in 2001, in 2002 Northwest operated only as a subcontractor performing a totally different job at the Lincoln Square site as a subcontractor, not a direct contractor. In U.S. Oil, the two parties entered into one contract under which the contractor intended to perform the same job over the course of many years. The factual scenario here is substantially different and cannot support a finding of intent to indemnify Bellevue Master for the work Northwest performed in 2002. Second, Plaintiffs cannot show that Northwest and Bellevue Master intended for a long-term indemnification for all of Northwest's work at Lincoln Square. Plaintiffs have only presented documents that state that insurance was to be obtained "on a per project basis." (Brady Decl., Ex. 2, Dkt. No. 39-2 at 11.) The unsigned 2001 purchase order between Northwest and Bellevue Master is also job-specific and does not show evidence of an intent to apply to future work at

ORDER — 13

Lincoln Square. (Brady Decl., Ex. 2, Dkt. No. 39-2 at 2.) The stated "terms of the contract" were that "no extra work to be done until you have a signed order from us," which also suggests that the contract was job-specific. (Id. at 4.) A sample insurance contract states that the "SUBCONTRACTOR shall obtain and keep in force during the term of the CONTRACT." (Brady Decl., Ex. 6, Dkt. No. 39-6 at 7.) As applied to Northwest, this may only mean that its 2001 contract was only to be kept in force for the duration of the work completed in 2001. These facts, construed in Plaintiffs' favor, suggest only that Northwest had agreed to indemnify Bellevue Master for the projects listed in the 2001 purchase order, but not to indemnify Bellevue Master for all work in the future at the Lincoln Square Project. There is no evidence of intent as in U.S. Oil.

Plaintiffs' reliance on certificates of insurance indicating they were additional insureds under Northwest's insurance is unavailing. Certificates are not the legal equivalent of a contract and are for informational purposes only. See Postlewait Const., Inc. v. Great Am. Ins. Cos., 106 Wn.2d 96, 100-01 (1986) ("a certificate of insurance is to inform the recipient thereof that insurance has been obtained; the certificate itself, however, is not the equivalent of an insurance policy").

Plaintiffs cannot defeat summary judgment on the mere inference that a contract exists that has terms different from the ones discussed by the parties. See Anderson, 477 U.S. at 249 (summary judgment is proper if evidence is merely colorable or not significantly probative). Plaintiffs have failed to produce sufficient evidence of a mutual intent to bind Defendants for Northwest's work in 2002, which is "an element essential to . . . [Plaintiffs'] case, and on which . . . .[Plaintiffs'] will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

**E.    No Executed Contract Exists Between Champion and Northwest Requiring Indemnification of Champion and Bellevue Master**

Plaintiffs contend that there was a contract formed between Champion and Northwest in 2002 that was "executed prior to loss" and that provides indemnification to Champion and Bellevue Master. Plaintiffs assert three theories under which a contract for indemnification

ORDER — 14

existed: (1) Northwest accepted the terms of the subcontract by performance and by failing to object to the terms of the subcontract; (2) Northwest accepted the terms of the subcontract by failing to object in writing; and (3) Northwest is bound by the subcontract under the implied-in-fact theory of contract. Defendants respond that no contract was executed under any proposed theory. Despite Plaintiffs' various theories, there was no contract for indemnification executed prior to loss.

### i.     Unaccepted Modification: No Assent and No Consideration

Plaintiffs contend Northwest agreed to provide insurance by failing to object to the subcontract sent by Champion in May, 2002, and by continuing to work at the site. Defendants respond that although an oral contract for the personnel hoist existed, there was no mutual assent to the insurance-related terms of the subcontract under either theory. Defendants rightly assert that the subcontract was a unilateral modification. They also insist that continued performance was done solely under the terms of the original oral contract and any failure to object to the subcontract cannot substitute for the lack of mutual assent to the terms of the subcontract and consideration.

A contract exists if there is mutual assent to the material terms of the agreement. Saluteen-Maschersky v. Countrywide Funding Corp., 105 Wn. App. 846, 851 (2001). Washington requires there to be objective manifestation of the parties to be bound by the essential terms of the agreement. See Wilson Court Ltd. P'Ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 699 (1998). The party asserting the existence of a contract has the burden to prove mutual intent. See Saluteen-Maschersky, 105 Wn. App. at 851. Unexpressed intentions are not admissible evidence of an intent to be bound. City of Everett v. Sumstad's Estate, 95 Wn.2d 853, 855 (1981). Further, any modification requires new, separate consideration, which is "any bargained for act or forbearance." Dragt v. Dragt/DeTray, LLC, 139 Wn. App. 560, 572 (2007) (finding the lack of new consideration fatal to an assertion that a modification to an existing contract bound the parties).

ORDER — 15

1   Both parties agree that Northwest and Champion entered into an oral agreement in which
2 there was a meeting of the minds as to the scope, price, and schedule of work for the personnel
3 hoist job. It is undisputed that the parties did not discuss any terms of insurance. After
4 Northwest completed erecting the personnel hoist, Champion then sent a subcontract containing
5 new material terms, including insurance coverage. This is a unilateral modification and there is no
6 evidence of new consideration. See Dragt, 139 Wn. App. at 572. The subcontract does not bind
7 Northwest.

8   Northwest did not accept the terms of the unilateral modification by performance.
9 Although Northwest's continued work might show objective assent to the terms of the
10 subcontract, there is no evidence of new bargained-for consideration. Rather, Northwest's
11 completion of the work and receipt of payment from Champion did not constitute a new benefit
12 conferred to Northwest. See Dragt, 139 Wn. App. at 572. Northwest merely completed
13 performance on the oral contract and did not accept the modification in the absence of new
14 consideration. See id. Moreover, the subcontract and purchase order did not invite acceptance
15 by performance. To the contrary, the purchase order stated that the agreement was "Subject to
16 the return of the signed subcontract which is attached herto [sic] and made a part of this Purchase
17 Order." (Dkt. No. 33-15.) Because there was no new consideration and no invitation to accept
18 by performance, a contract requiring indemnification was never "executed."

19   Plaintiffs also contend that Northwest manifested an intent to be bound by the terms of the
20 subcontract by failing to tell Champion that it rejected the subcontract. This arguments is without
21 merit. "Failure to reject an offer is not equivalent to assent of that contract since silence is
22 acceptance only where there is a duty to speak." Saluteen-Maschersky, 105 Wn. App. at 853.
23 Plaintiffs have shown no duty upon Northwest to speak. The purchase order's invited mode of
24 acceptance was the return of the signed subcontract. (Olson Decl. Ex 14.) Northwest rejected
25 the contract by the terms of the Purchase Order by not returning the signed subcontract, which
26 was made part of the Purchase Order. (See id.) Plaintiffs overlook the requirement that
27

ORDER — 16

"acceptance must manifest assent to the same bargain proposed by the offer, and must also comply with the terms of the offer as to the identity of the offeree and the mode of manifesting acceptance." Restatement (Second) of Contracts § 50 cmt. a (1981).

The Court finds that no contract was formed by Northwest's continued performance or failure to object to the terms of the contract.

### ii. No Contract Formed by Failure to Object in Writing

Plaintiffs contend that Northwest's failure to object in writing shows it agreed to the terms of the subcontract. This is without merit. The requirement that Northwest object in writing is contained within the contract itself. Because Northwest never agreed to the terms of the contract, and for the reasons described in subsection "i" above, it had no duty to respond in writing to reject this new offer to contract. By the terms of the purchase order, failure to "return the signed subcontract" was evidence of a rejection of the modification in and of itself. No contract was formed by failure to make written objections.

### iii. No Implied-in-Fact Contract

Plaintiffs further contend that an implied-in-fact contract for insurance between Northwest and Champion existed "not from the parties' words, but instead from actions or circumstances that demonstrate a mutual intention to enter into a contract." (Pls' Opp. to Mot. for SJ, Dkt. No. 40, at 17.) Plaintiffs have not shown the requisite mutual intent to contract in order for there to be an implied-in-fact contract. See Hoglund v. Meeks, 139 Wn. App. 854, 870 (2007) (a contract may only be implied-in-fact if there is evidence of mutual assent). Construing the facts as the Court must, there is insufficient evidence that Northwest presented an objective assent to be bound, or that there was any new bargained for consideration. Rather, the undisputed facts show that Northwest did not sign the contract offered by Champion that expressly required acceptance by signed return of the subcontract. Continued performance based on the original contract is not evidence of a mutual intent to be bound by the terms of the subcontract, a unilateral modification. The existence of a certificate of insurance issued the day after the 2002 accident is not evidence of

ORDER — 17

mutual intent to contract.  See Postlewait, 106 Wn.2d at 100-01 (a certificate of insurance is not a contract).  No contract can be implied-in-fact.

**Conclusion**

Having considered Plaintiffs' objections to Defendants' relevant exhibits, the Court DENIES Plaintiffs' motion to strike.  The Court DENIES Plaintiffs' motion to continue discovery; Plaintiffs have not persuaded the Court of the utility of continued discovery.  Based on Plaintiffs' failure to show any disputed material facts that the Court can construe to show a contract was executed prior to loss, the Court GRANTS Defendants' motions for summary judgment and DISMISSES Plaintiffs' claims WITH PREJUDICE.

The Clerk is directed to send copies of this order to all counsel of record.

Dated:   March 4, 2008

Marsha J. Pechman
U.S. District Judge

ORDER — 18