UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EVANSTON INSURANCE COMPANY, and AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>WESTCHESTER SURPLUS LINES INSURANCE COMPANY, ROYAL INSURANCE COMPANY OF AMERICA, ROYAL INDEMNITY COMPANY, NORTHWEST TOWER CRANE SERVICE, INC., AND JOHN DOES I-V,<br><br>Defendant. | CASE NO. C07-923<br><br>ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT |

The matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 88, 92, 96.) Having reviewed the motions, the responses (Dkt. Nos. 102, 105, 107, 109), the replies (Dkt. Nos. 112, 114, 117), and all papers submitted with the motions, and having heard oral argument on August 10, 2010, the Court DENIES the motions. The Court GRANTS in part and DENIES in part the parties' motions to strike.

**Background**

This insurance dispute arises out of an accident that occurred on a large construction site in Bellevue, Washington, called the "Lincoln Square Project." On June 26, 2002, a Champion US2200 personnel hoist fell and injured three employees of Northwest Tower Crane Services, Inc. ("Northwest"), a subcontractor working at the Lincoln Square Project. The hoist incident occurred as Bellevue Master sought to "mothball" the Lincoln Square Project in the summer of 2002. After the accident, the injured employees sued Champion Elevators, Inc. (Champion), the owners of the hoist involved in the accident. Champion's insurer, Evanston Insurance Company ("Evanston"), filed a third-party claim against the general contractor of the project, Bellevue Master LLC. American Guarantee and Liability Insurance Company ("American Guarantee") insured Bellevue Master. American Guarantee and Evanston settled the injured employees' claims. American Guarantee and Evanston filed suit against Northwest and its insurers, Westchester Surplus Lines Insurance Company ("Westchester") and Royal Insurance Company of America ("Royal"), seeking coverage under Northwest's insurance policies. Both Westchester and Royal refused to provide any coverage, arguing that Bellevue Master was not made an additional insured on Northwest's insurance policies.

The parties dispute whether Northwest added Bellevue Master as an additional insured to its policies with Westchester and Royal. The Westchester policy grants additional insured status to third-parties "as required by contract, provided the contract is executed prior to loss." (Dkt. No. 51 at 11.) Royal owes a duty to provide excess insurance if Westchester owes the primary insurance coverage. (Dkt. No. 92 at 8.) The Court previously found that Plaintiffs failed to show evidence of a contract that required Bellevue Master to be named as an additional insured, and granted summary judgment in favor of Defendants. (Dkt. No. 51.) On appeal, the Ninth

1  Circuit reversed and remanded for additional discovery without reaching any of the merits of the
2  Court's decision. (Dkt. No. 59.)

3  Having conducted additional discovery on remand, American Guarantee presents a new
4  theory to support its claim. American Guarantee argues that Bellevue Master and Northwest
5  entered into a contract for the dismantling Champion US2200 lift that required Bellevue Master
6  to be named as an additional insured on Northwest's policies. The evidence of the offer is fairly
7  straightforward. On June 4, 2002, Jerry Ozmet of Bovis Lend Lease, the construction manager
8  for the Lincoln Square Project, sent a fax to David Weber of Northwest requesting information
9  as to the cost of the dismantling and load out of two cranes and "the hoist on the hotel." (Dkt.
10 No. 97-7 at 107; Dkt. No. 97-11 at 13-14 (Ozmet Dep. at 42:23-43:2).) This was not a request to
11 dismantle the accident lift. On June 10, 2002, in response to Ozmet's fax, Weber sent a "Fax
12 Transmittal for Bid/Quote" in which he quoted a price for dismantling both a dual hoist and a
13 single hoist. (Dkt. No. 97-7 at 108.) The single hoist was the hoist involved in the accident.
14 (Dkt. No. 97-10 at 6 (Mantle Dep. at 23:6-8); Dkt. No. 97-11 at 12 (Ozmet Dep. at 38:7-23).)
15 Ozmet clarified at his deposition that he did not ask for a quote on the dismantling of the single
16 hoist, only the dual hoist. (Ozmet Dep. at 43:16-21.) Ozmet did not know why David Weber
17 returned a quote for the single hoist. (Id.) Ozmet testified that "I did not ask him to take down
18 [the] single" personnel hoist. (Dkt. No. 97-11 at 15 (Ozmet Dep. at 44:8).)

19 American Guarantee points to evidence of Bellevue Master's acceptance of Northwest's
20 bid to dismantle the accident lift. Weber testified that that he received a phone call from
21 someone at Bellevue Master accepting the bid, although he does not recall precisely who it was
22 or when. (Weber Dep. at 90:18-23 (Dkt. No. 97-7 at 19).) This is purportedly common practice.
23 (Weber Dep. of April 26, 2004 at 39:21-40:9.) Ozmet, however, testified that he did not receive
24

the bid/offer fax from Weber that was sent on June 10, 2002. (Ozmet Dep. at 43:7-15.) On the date of the accident Northwest employees were in the accident hoist, and a billing invoice worksheet from Northwest shows that as of June 26, 2002, Northwest was dismantling the Champion US2200 hoist. (Dkt. No. 97-7 at 105.) The invoice sent to Bellevue Master, however, states that the dismantling and load out of the accident lift took place on June 27, 2002. (Dkt. No. 97-7 at 81.) On July 8, 2002, Northwest submitted its invoice to Bellevue Master, and on July 15, 2002, Bellevue Master issued a check to Northwest for dismantling the accident hoist. (Dkt. No. 97-10 at 52; Dkt. No. 97-10 at 53.) Tony Mantle, concrete superintendant for Bellevue Master at the time of the accident, approved the bill. (Dkt. No. 97-10 at 6 (Mantle Dep. at 6:20-22); Dkt. No. 97-10 at 8 (Mantle Dep. at 35:12-23).)

American Guarantee argues this new contract includes Northwest's offer to name Bellevue Master as an additional insured on Northwest's policies. The bid from Northwest contains the following: "Bid/Quote is based on . . . current insurance levels. . . ." (Dkt. No. 97-7 at 108.) Weber explained his understanding of the phrase as follows: "It's basically stating that the insurance we have in force during the time of the quote is what the quote is based on, and if they want more insurance they have to pay for it." (Dkt. No. 97-7 at 19 (Weber Dep. at 90:7-10).) Weber also testified, however, that he was not asked to provide additional insured coverage to Bellevue Master. (Weber Dep. at 20:11-22:4.) Ozmet did not know what the current insurance levels were: "I mean I don't know what those were. I assume it was based on his dealings with the office and whatever the state of Washington required. I'm not sure." (Dkt. No. 97-11 at 16 (Ozmet Dep. at 45:6-16.) Ozmet also stated that he "didn't deal with insurance," but that someone else at Bovis did. (Ozmet Dep. at 45:18.)

Defendants maintain that the only contract covering the dismantling of the Champion US2200 lift is a contract between Champion and Bellevue Master. Bellevue Master and Champion signed a rental agreement in May of 2002 that covered the accident hoist. (Dkt. No. 97-19 at 79.) The agreement "includes, at an addition [sic] cost, initial equipment installation of $22,100, jumps of $2,000 each, and equipment dismantle of $14,500." (Id.) Champion attempted to subcontract the work to Northwest, but Northwest did not sign the subcontract. (Weber Dep. at 23:1-6.) Plaintiff presents a declaration from Champion's Executive Vice President, who states that Champion did not dismantle the accident hoist, did not receive a bill from Northwest for the work, and did not pay Northwest for the dismantling of the hoist. (Jensen Decl. ¶¶ 8-10.) The parties thus dispute whether Northwest did the dismantling work directly for Bellevue Master or for Champion. According to testimony of Weber, Northwest earned more money by working directly for Bellevue Master and Bellevue Master paid less than it would have to Champion for the same work. (Weber Dep. at 73:8-74:7.)

**Analysis**

A.     Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Genuine issues of material fact are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Because a mere scintilla of evidence is insufficient to create a factual dispute, the non-moving party must set forth specific facts demonstrating a genuine issue of fact for trial. Id. at 252. In ruling on summary judgment, the court does not weigh evidence to determine the truth of the

matter, but "only determine[s] whether there is a genuine issue for trial." Crane v. Conoco, Inc., 41 F.3d 547, 549 (9th Cir. 1994).

B.  Previous Order's Applicability

The Court asked the parties at oral argument what elements of the previous order on summary judgment survive. After consideration of the parties' positions and the Ninth Circuit's memorandum decision, the Court finds that only certain portions prior order remain in force. Because the parties have engaged in new discovery that has changed the factual landscape, the Court does not rely on any of the statements of fact in the previous opinion or any conclusions based upon those facts. The previous order's statements of the law remain in force. In particular, the Court will not revisit its decision regarding the definition of the term "executed" in the Westchester policy. (Dkt. No. 51 at 11-12.) The Court stands by its earlier statement that "[c]ertificates are not the legal equivalent of a contract and are for informational purposes only." (Dkt. No. 51 at 14.) The Court reaffirms its statements of the law on contracts contained in pages 15 through 18 of the prior order.

C.  Contract Formation

The parties dispute whether and when Northwest and Bellevue Master contracted for the removal of the accident hoist. The Court finds there to have been a clear offer from Weber to Ozmet for the dismantling and load out of the Champion hoist involved in the accident. There evidence as to acceptance is less obvious. On the one hand, Ozmet testified that he did not receive the bid from Weber and that he did not request Weber provide such a bid. (Ozmet Dep. at 43:7-21.) On the other hand, Weber testifies that someone from Bellevue Master called him and accepted his bid. (Weber Dep. at 90:18-23.) When this occurred is not clear. In American Guarantee's favor, there is substantial evidence that Northwest performed the work outlined in

1  Weber's bid. Despite this, there remains disputed facts as to how and when Bellevue Master
2  may have accepted the offer from Northwest. Resolution of the dispute requires the Court to
3  weigh the credibility of various witnesses and to make findings of fact based on circumstantial
4  evidence. This must be resolved by the fact finder. The Court DENIES the motions on this
5  issue.
6        Defendants maintain that the only contract at issue is between Champion and Bellevue
7  Master. This is not entirely accurate. There is undisputed evidence that Champion and Bellevue
8  Master executed a contract prior to the accident that provided Champion would dismantle the
9  accident hoist "at an additional cost." (Dkt. No. 97-10 at 79.) While the parties do not dispute
10 seriously that this contract existed, American Guarantee has shown that there are disputed issues
11 of fact tending to show that Northwest and Bellevue Master contracted directly for this very
12 same work. The Champion/Bellevue Master contract does not make it impossible or even
13 improbable that Bellevue Master and Northwest contracted separately for the dismantling of the
14 accident hoist. American Guarantee has provided substantial evidence that Northwest earned
15 more by contracting directly with Bellevue Master and that Bellevue Master spent less by hiring
16 Northwest directly. The Court thus rejects Defendants' argument that the only contract that
17 could possibly have required Northwest to add Bellevue Master as an additional insured is the
18 one between Champion and Bellevue Master. The Court does not reach the issue of whether or
19 not the Champion/Bellevue Master contract includes an agreement that Champion would
20 dismantle the hoist or whether it is just an option contract for Bellevue Master to later chose
21 Champion to do this work.
22 \\
23 \\
24

1   D.     Disputed Terms of Contract

2      The parties dispute whether the offer from Weber to Bellevue Master for the accident
3   hoist dismantle and load out includes an agreement to add Bellevue Master as an additional
4   insured to Northwest's policies.  Disputed issues of fact preclude resolution of this issue on the
5   pending motions.

6      American Guarantee argues that Weber's bid/offer includes an agreement that Northwest
7   would add Bellevue Master as an additional insured.  The fax form states that the "Bid/Quote is
8   based on . . . current insurance levels. . . ." (Dkt. No. 97-7 at 109.)  The parties dispute what this
9   phrase means.  American Guarantee argues it means Northwest agreed to add Bellevue Master as
10  an additional insured as it had done for other jobs performed at the Lincoln Square Project.
11  Weber testified that "[i]t's basically stating that the insurance we have in force during the time of
12  the quote is what the quote is based on, and if they want more insurance they have to pay for it."
13  (Weber Dep. at 90:7-10.)  He also testified, however, that he "to the best of my memory we did
14  not, were not asked to" provide additional insurance coverage to the Bellevue Master.  (Weber
15  Dep. at 20:11-18.)  Ozmet testified that he had little idea what the phrase meant, but that he
16  "assume[d] it was based on his [Weber's] dealings with the office and whatever the state of
17  Washington required.  I'm not sure." (Ozmet Dep. at 45:13-16 (Dkt. No. 97-11 at 16).)
18  Defendants argue that the phrase "current insurance levels" is merely boilerplate language with
19  no effect.  They support this assertion with testimony from Weber and Ozmet, stating that neither
20  one considered the insurance aspects of the bid and dismantling of the hoist.  In particular,
21  Ozmet testified that he did not discuss insurance with Weber or even see the bid. (Ozmet Dep. at
22  60.)  The evidence and testimony provided by the parties convinces the Court that disputed facts

23

24

preclude any ruling as to what is meant by the term "current insurance levels." This precludes the granting of summary judgment in favor of either party.

American Guarantee contends that the extrinsic evidence as to the term "current insurance levels" warrants granting summary judgment in its favor. The Court disagrees. American Guarantee argues that no subcontractors were allowed to work at Lincoln Square without naming Bellevue Master as an additional insured at the project. (Dkt. No. 97-6 at 17-32.) It points out that Northwest did a lot of work throughout 2001 and 2002 directly for Bellevue Master and thus would have had to have such insurance in order to have done the work they did. (See Mantle Dep. at 6-7 (Dkt. No. 97-10 at 3).) There is evidence that Bellevue Master's insurance requirements were faxed to Northwest in 2001, and that Northwest faxed them to its insurance broker. (Id. at 12-13; York Dep. at 19-20.) American Guarantee points to certificates of insurance that Northwest's insurance broker issued showing Bellevue Master as an additional insured in 2001. (Dkt. No. 14-15.) There is also evidence that Northwest's insurance broker tracked who had been named an additional insured, and that in April 2002, the broker believed Bellevue Master was an additional insured on Northwest's Westchester and Royal policies. (Dkt. No. 96 at 17.) A certificate exists showing Bellevue Master as an additional insured "per job contract" at time of the bid from Weber and the accident. (Dkt. No. 100-2 at 60.) Weber also testified in 2004 that he "want[ed] to say that Bellevue Master bought up our insurance when we took their crane down" and paid for a higher level of coverage as an additional insured beyond the $2 million that Northwest offered. (Weber Dep. of April 26, 2004 at 42:3-22 (Dkt. No. 97-8 at 5).) While this is significant evidence that weighs in American Guarantee's favor, it conflicts with testimony from Ozmet and Weber as to the meaning of

"current insurance levels." The Court cannot grant summary judgment on this evidence alone without weighing the evidence and the testimony of the various witnesses.

The Court DENIES the cross motions for summary judgment on this issue. Assuming that Bellevue Master accepted Weber's bid, disputed issues of fact exist as to whether the contract required Bellevue Master to be named as an additional insured on Northwest's Westchester and Royal policies.

E.   Motions to Strike

Defendants ask the Court to strike the declaration of James Jensen. (Dkt. No. 102 at 13.) Westchester claims Jensen lacks person knowledge and that he bases his statements on hearsay, speculation, and opinion. Jensen was the executive vice president of Champion at the time of the lift accident. American Guarantee argues that Jensen had personal knowledge because he was the boss of the Kevin Lavorgna, who attempted to arrange the contract with Northwest for Champion and that only Jensen could approve it. (Dkt. No. 117 at 9.) The record attached to Jensen's declaration suggests that he had knowledge as to whether Northwest contracted with Champion for the removal. That testimony is admissible. However, his statement interpreting the unsigned subcontract is inadmissible legal opinion that the Court STRIKES. (Jensen Decl. ¶ 6.) His other testimony is allowed and the Court DENIES the motion to strike to this extent.

Defendants ask the Court to strike portions of the Mark Lawless' declaration. Lawless is American Guarantee's expert witness on construction matters. Westchester argues that Lawless offers impermissible, legal opinions in paragraphs 10 through 21. Lawless' declaration does contain certain legal conclusions that are not proper. The Court STRIKES the phrase "as was done in this case" that appears in paragraphs 11, 12, and 18, which converts his statements into legal conclusions. The sentences in which the phrase appears is otherwise permissible general

testimony about custom and practice in the construction industry. The Court also STRIKES the last sentence in paragraph 16, which provides a legal conclusion as to whether Northwest had named Bellevue Master as an additional insured. The Court also STRIKES paragraph 20, which is vague. The remainder of the motion to strike is DENIED.

Defendants request the Court strike the declaration of James Majesky as being beyond the scope of his personal knowledge and as including inadmissible legal opinion. (Dkt. No. 102 at 17-18.) In paragraph 10, Majesky states that Northwest named Bellevue Master as an additional insured. This statement is a legal conclusion that turns on disputed facts. The Court STRIKES this paragraph. The Court also STRIKES the third sentence in paragraph 12 of Majesky's declaration, which is a legal conclusion as to the insurer's intent to provide coverage to Bellevue Master. To the extent that Majesky testifies as to the meaning of specific contract terms, he offers his interpretation based on his experience in the insurance industry. This testimony is acceptable. The remainder of the motion to strike is DENIED.

American Guarantee asks the Court to strike a document submitted by Westchester in docket number 89-4 at 14. (Dkt. No. 109 at 8.) The Court STRIKES this document, as it has not been authenticated.

**Conclusion**

American Guarantee has found substantial evidence to support its argument that Northwest added Bellevue Master as an additional insured prior to the accident involving the Champion US2200 lift. However, the testimony and evidence remains in dispute on several key points as to contract formation. Even assuming such a contract was formed, there are disputes issues of fact as to whether it required Northwest to add Bellevue Master as an additional insured. The finder of fact must examine these disputed facts and weigh the credibility of the

various witnesses at trial to determine the outcome of this case. The court DENIES the motions for summary judgment. The Court also GRANTS in part and DENIES in part the various motions to strike, as explained above.

The Clerk is directed to send a copy of this order to all counsel of record.

Dated this 11th day of August 2010.

Marsha J. Pechman
United States District Judge